# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000

October 3, 2023

VIA ECF

The Honorable Edgardo Ramos
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   *Esperion Therapeutics, Inc. v. Daiichi Sankyo Europe GmbH*, 23-cv-02568 (S.D.N.Y.)

Dear Judge Ramos:

We are counsel to Plaintiff Esperion Therapeutics, Inc. ("Esperion"). After equivocating for months,[1] Defendant Daiichi Sankyo Europe GmbH ("DSE") is now refusing to collect, review, and produce *any* documents held by its Japanese parent company, Daiichi Sankyo Company, Ltd. ("DS Japan"). DS Japan was deeply involved in all aspects of the parties' relationship—performing due diligence (with 13 DS Japan individuals having access to the data room), preparing the initial term sheet, attending in-person negotiation sessions, and negotiating and approving the License Agreement at the heart of this case. DSE and DS Japan operate arm-in-arm, and many DS Japan documents will be highly probative of key factual issues in this case. Because the record confirms that this evidence "flows freely" between DSE and DS Japan, and that DSE has the "practical ability" to obtain it, DSE should be required to obtain and produce responsive documents of DS Japan.

DSE is refusing to review *any* documents held by DS Japan—arguing that because these documents are held by a different corporate entity in a different country, this evidence is unavailable to Esperion and the Court. DSE's refusal to comply with its discovery obligations is yet another attempt to delay this case and to inflict further financial costs on Esperion by requiring Esperion to move to compel.[2] Esperion therefore respectfully requests a pre-motion conference pursuant to Local Civil Rule 37.2. In that motion, Esperion would ask this Court to rule that DSE has legal possession, custody, or control of certain DS Japan documents and that DSE must collect, review, and produce those documents. It would also seek fees and costs incurred as a result of DSE's discovery non-compliance.

---

[1] The parties first discussed this issue during a July 20, 2023 meet-and-confer. The parties exchanged further correspondence over the next several weeks, during which DSE oscillated between categorically refusing to documents from DS Japan and stating that it would consider "agree[ing] to conduct . . . additional targeted searches for documents or communications" held by DS Japan. After Esperion repeatedly pressed DSE, DSE finally confirmed on September 19 that it would not produce any DS Japan documents. Despite Esperion's best efforts to reach resolution, the parties are at an impasse.

[2] DSE already tried to postpone the Court-ordered April 2024 trial date, barely two months into discovery. *See* ECF No. 55. The Court denied that application. *See* ECF No. 56.

Beijing • Brussels • Century City • Dallas • Denver • Dubai • Frankfurt • Hong Kong • Houston • London • Los Angeles • Munich
New York • Orange County • Palo Alto • Paris • San Francisco • São Paulo • Singapore • Washington, D.C.

As the Court knows, this case is urgent and existential for Esperion. At the same time Esperion seeks declaratory relief from the Court, Esperion is diligently complying with its obligations and all Court-ordered discovery deadlines. *See* ECF No. 61. It is critical that the parties adhere to the Court-ordered schedule, with trial scheduled in April 2024. DSE should not be permitted to use its discovery non-compliance as an excuse to delay resolution of this action, which was caused by DSE's repudiation of its contractual obligations in the first place. If the Court orders the relief Esperion seeks, Esperion will meet and confer with DSE to tailor its requests applicable to DS Japan documents, including through the identification of a limited number of custodians and the application of search terms, so that responsive documents can be identified, reviewed, and produced expeditiously. If DSE will not produce documents from DS Japan despite the Court ordering it to do so, Esperion would respectfully request that the Court impose preclusive sanctions and draw adverse inferences.

It is axiomatic that documents are discoverable if they are in a party's "possession, custody, or control," Fed. R. Civ. P. 34(a)(1), "regardless of where the documents are located," *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 236 F.R.D. 177, 182 (S.D.N.Y. 2006). As courts in this District have recognized in compelling the production of documents from non-party foreign affiliates like DS Japan, "[t]he fact that the documents are situated in a foreign country does not bar their discovery." *Cooper Indus., Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918, 920 (S.D.N.Y. 1984). As Judge Pauley observed, were it otherwise, "many domestic corporations would have a foreign affiliate for storing sensitive documents" so as to "evade discovery." *Hunter Douglas, Inc. v. Comfortex Corp.*, 1999 WL 14007, at *3 n.7 (S.D.N.Y. Jan. 11, 1999). DSE cannot bury relevant evidence just because it is held by a different corporate entity in a different country.

Control by a party-defendant such as DSE has been found where it "can 'obtain documents from its foreign parent to assist itself in litigation;' where [it] can 'easily obtain' documents from its parent when it has an interest in doing so; where documents ordinarily flow freely between them; or where [it] has the practical ability to obtain the requested documents for use in its business." *Doe Run Peru S.R.L. v. Trafigura AG*, 2011 WL 13059042, at *2 (D. Conn. Aug. 24, 2011); *accord Hunter Douglas*, 1999 WL 14007, at *3 ("[T]he test focuses on whether the corporation has 'access to the documents' and 'ability to obtain the documents.'") (quoting *Addamax Corp. v. Open Software Found., Inc.*, 148 F.R.D. 462, 467 (D. Mass. 1993)); *see also In re Namenda Direct Purchaser Antitrust Litig.*, 2017 WL 3822883, at *6 (S.D.N.Y. Aug. 30, 2017) ("'Control' is construed broadly to encompass documents that the respondent has 'the legal right, authority, or practical ability to obtain . . . upon demand.'") (citation omitted).

Even based on the limited record available to Esperion and the Court, it is clear that relevant documents "flow freely" between DSE and DS Japan, and that DSE has the "practical ability" to obtain them. DS Japan has been deeply involved in all aspects of the parties' relationship—due diligence, preparing the initial term sheet, attending in-person negotiation sessions, and negotiating and approving the parties' License Agreement. For example, Mayu Imamura, DSE's Vice President of Business Development, has served for years as a conduit between DSE and DS Japan on matters relating to Esperion and its ground-breaking bempedoic acid drugs. Before DSE even sent a statement of interest to Esperion, DSE internal correspondence reveals that Ms. Imamura was meeting with "Kobu-san" for his "input" on bempedoic acid drug licensing. Ex. A. Masahiko Ohtsuki, a DS Japan employee, was involved in preparing the term sheet that led to the License Agreement. Ex. B at 4. A Tokyo-based team of DS Japan employees conducted due diligence on Esperion's products in connection with DSE's decision to enter into the License Agreement—at

**GIBSON DUNN**

least 13 DS Japan individuals requested access to the Esperion data room—and DS Japan assigned a different affiliate, the United States-based Daiichi Sankyo, Inc. ("DS USA"), to conduct diligence on clinical trials of Esperion's products. Ex. C; Ex. D (DS Japan requests to be "in the loop"). *And perhaps most relevantly, employees of DS Japan, including Miki Mashimo, participated directly in the negotiation, review, and approval of the License Agreement at the heart of this case*. Exs. E–G. At least three DS Japan employees attended in-person meetings with Esperion. Ex. H.

Not long after DSE and Esperion entered into the License Agreement, DS Japan and Esperion reached a separate agreement for DS Japan to distribute Esperion's products in Asia and Latin America. DSE and DS Japan, now both commercial partners to Esperion for the very same products, collaborate extensively such that information and know-how about Esperion's products "flow[s] freely" between them. *Doe Run Peru*, 2011 WL 13059042, at *2; *see also* Ex. I (monthly call involving Esperion, DS Japan, and DSE). DS Japan regularly provides information on Esperion's products to DSE. Ex. J at *2234, *2238 (DSE to be single point of contact with Esperion, with collaboration behind the scenes); Ex. K (reporting update from DS Japan to DSE); Ex. L (same). In 2020, DS Japan executed a three-way agreement with DSE and Esperion to facilitate commercialization of Esperion's products worldwide, a relationship among all three entities that continues to this day. Ex. M (CTRL_REL0002205596.0001). DSE and DS Japan executives even have overlapping roles in both entities: for example, until recently, DSE's CEO, Jan Van Ruymbeke, simultaneously served as Head of the EU Specialty Business Unit for DS Japan; now, Oliver Appelhans is replacing Dr. Van Ruymbeke in both those roles.

In short, even based on the limited information known to Esperion, it is evident that DSE and DS Japan operate arm-in-arm. DS Japan "utilizes" DSE as an "instrumentality" to further its interests, including with respect to the negotiation and eventual repudiation of the License Agreement. *In re Vivendi Universal, S.A. Sec. Litig.*, 2009 WL 8588405, at *3 (S.D.N.Y. July 10, 2009). DSE has the "practical ability to obtain documents" from DS Japan "upon demand," as it did when it obtained and relied upon DS Japan's diligence. *In re Namenda*, 2017 WL 3822883, at *6. And information has flowed and continues to "flow freely between" DSE and DS Japan. *Doe Run Peru*, 2011 WL 13059042, at *2. Because DSE "has access to . . . and can produce" DS Japan's documents, Esperion is "entitled to the production" of documents from custodians at DS Japan with relevant information about the negotiation of the License Agreement and the performance and repudiation thereunder. *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 139 (2d Cir. 2007).

If DSE will not produce documents from DS Japan, Esperion is entitled to adverse inferences and preclusive sanctions preventing DSE from relying on related documents at trial. *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (sanctions warranted where "party having control over the evidence had an obligation to timely produce it" and fails to do so with culpable state of mind); *see also In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) (obligation can arise from Fed. R. Civ. P. 26 or court order); Fed. R. Civ. P. 37(b)(2)(a)(i)–(ii).

**GIBSON DUNN**

Respectfully,

Orin Snyder

*Counsel for Plaintiff Esperion Therapeutics, Inc.*

GIBSON, DUNN & CRUTCHER, LLP
200 Park Ave.
New York, NY 10166
osnyder@gibsondunn.com
(212)-351-2400