**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

December 3, 2023

VIA ECF

The Honorable Edgardo Ramos
United States District Court, Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   *Esperion Therapeutics, Inc. v. Daiichi Sankyo Europe GmbH*, 23-cv-02568 (S.D.N.Y.)

Dear Judge Ramos:

We respectfully submit this letter on behalf of Plaintiff Esperion Therapeutics, Inc. ("Esperion") concerning Esperion's fully-submitted motion for judgment on the pleadings under Rule 12(c) (the "Motion," Dkt. 75), and Defendant Daiichi Sankyo Europe GmbH's ("DSE") December 1, 2023 sur-reply (the "Sur-Reply," Dkt. 104). We respectfully request the Court accept this short letter to correct the misleading and incomplete record presented in DSE's Sur-Reply.

Esperion's opening and reply briefs demonstrate the unambiguous terms of the Agreement between the parties require judgment in favor of Esperion. DSE's Sur-Reply tries to stave off judgment with stray extrinsic evidence—one email and excerpted deposition testimony.

New York law is clear. Where, as here, the language of the governing agreement is unambiguous, the Court should not (and cannot) consider evidence outside the text of the agreement itself. *Goldman v. White Plains Ctr. for Nursing Care, LLC*, 11 N.Y.3d 173, 176 (2008). The whole point of a Rule 12(c) motion in a contract dispute is to resolve the case based on the unambiguous text of the agreement, without any need to waste judicial resources weighing dueling witness testimony, documentary evidence, and experts. Nearly everything in DSE's Sur-Reply cannot be considered on the Motion.

If extrinsic evidence could be considered at this stage, the evidence would confirm the Agreement means what Esperion says. DSE's Sur-Reply tries to muddy the waters with cherry-picked and distorted fragments of extrinsic evidence. But the actual record—the words of the Agreement, the parties' negotiating history, and the documentary and testimonial evidence evincing the parties' intent—proves DSE is wrong and Esperion is right.

**To Correct The Record: The Parties Expressly Rejected Tying the Milestone Payment to MACE-4.** DSE's entire litigation position boils down to this: the Regulatory Milestone Payment in Section 9.2 can be triggered *only* by MACE-4—even though Section 9.2 never actually uses the term "MACE-4," "primary endpoint," or any specific endpoint in particular. DSE's "MACE-4 Only" position has no support in the words of the Agreement. As Esperion alleged in the First Amended Complaint ("FAC," Dkt. 19), it is also refuted by the clear negotiation and drafting history between the parties.

On November 30, 2018, DSE proposed a draft of Section 9.2 of the Agreement that would have conditioned the amount of the Regulatory Milestone Payment on the MACE-4 primary endpoint. FAC ¶¶ 37–39. On December 11, Esperion *rejected* that revision and proposed instead what became the broad, general terms the parties ultimately agreed to in Section 9.2 of the final Agreement—*omitting* any reference to MACE-4, the primary endpoint, or any specific endpoint

GIBSON DUNN

at all. *Id.* ¶¶ 40–42. Given an opportunity to present its most compelling extrinsic evidence, DSE does not say anything in its Sur-Reply about this dispositive negotiation and drafting evidence.

**To Correct The Record: Deposition Testimony Corroborates Precisely What Esperion Has Alleged.** Last week, two separate witnesses . Tellingly, DSE's Sur-Reply did not mention either witness.

**To Correct The Record: The Documents DSE Relies On Prove It Is Wrong.** Faced with the reality that the Agreement does not mention "MACE-4" or "primary endpoint"—in Section 9.2 or anywhere else—DSE's Rule 12(c) opposition brief strung together the best argument from the text it could muster. Specifically, DSE argued that the Agreement *does* include the term "MACE-4" through a chain of references: Section 9.2 mentions the "CLEAR Outcomes Study"; schedules annexed to the Agreement describe the CLEAR Outcomes Study as "assessing the occurrence of MACE"; the CLEAR Outcomes Study was governed by a Clinical Study Protocol; and one bullet-point on one page of the Clinical Study Protocol defined the primary endpoint of the Study as MACE-4. Opposition 6. Through this four-step dance, DSE represented to the Court that the Agreement "specifically mention[s] MACE-4." Opposition 15.

But the record has proven DSE wrong here, too. 

GIBSON DUNN

[REDACTED] The only text in the Agreement that DSE says refers to MACE-4, in reality, means *any individual component of MACE-4*. This disproves a key pillar of DSE's Rule 12(c) opposition.

**To Correct The Record: DSE's Extrinsic Evidence Is Irrelevant And Misleading.** In this litigation, DSE cannot rely on the plain language of Section 9.2, the negotiation history of Section 9.2, or the definitions incorporated in Section 9.2 by reference. So, it needs to find some evidence that words mean the opposite of what they say, and contracts incorporate words that never appear. [REDACTED][1]

\* \* \* \* \*

Having corrected the record, it is important to state again: none of this extrinsic evidence can or should be considered in this Rule 12(c) motion. Because the Agreement is unambiguous, New York law precludes consideration of this or any other extrinsic evidence. We regret the need to burden the Court with a further submission. But the incomplete and misleading discussion of the discovery record in DSE's Sur-Reply made it necessary for Esperion to correct the record.

We thank the Court for its consideration.

Respectfully,

*Orin Snyder*

Orin Snyder

Cc: All counsel of record (via ECF)

---

[1] At last resort, DSE relies on the self-serving testimony of its own executive, Dr. Philipp Hoffman. Sur-Reply 3. [REDACTED]